## Stewart, Appellant, v. Stewart.

Argued April 17, 1952. Before RHODES, P. J., HIRT, RENO, DITHRICH, ROSS, ARNOLD and GUNTHER, JJ.

*Lee C. McCandless,* with him *Painter & Painter,* for appellant.

*John N. Gazetos,* for appellee.

OPINION BY RENO, J., July 17, 1952:

The husband-appellant sued for a divorce, alleging indignities. The court below, upon the petition of defendant's sister, found defendant "a person of unsound mind", and appointed the sister guardian ad litem. The master recommended a divorce. Upon exceptions, the court below, concluding that defendant's conduct resulted from her mental condition, refused a decree. Our independent study of all the testimony has induced a similar conclusion, and the dismissal of the complaint will be affirmed.

The parties were married on September 22, 1947; he was then about 20 years of age, she 17. A child was born in August, 1948. They lived with the husband's father and his family until June, 1949, when they moved to an apartment. After two months she left, and went to reside with a sister.

At the time of the master's hearings defendant was confined to a mental health hospital, and could not testify. Her husband's testimony stands on the record without her refutation. Even so, the testimony is replete with contradictions, a great deal of which is irrelevant contravention of immaterial testimony. Yet it does establish, to quote from the able opinion of the learned president judge, defendant's ". . . failure to perform the multitudinous duties usually devolving on a wife; her refusal to have sexual intercourse; her leaving her home and baby without informing those remaining in the home where she was going or when

she would be back; her treatment of her husband, but most of all her unnatural conduct towards her baby convinces us that there is something radically wrong with this marriage." It is gravely doubtful whether the course of conduct thus summarized sufficiently established indignities to the person. Certainly, in view of her admittedly abnormal mental condition, her conduct could not result from a state of settled hate and estrangement, the basic and indispensable ingredient of the divorce ground of indignities.

When her mental abnormality first became noticeable is the subject of conflicting testimony. Assuredly, she was completely normal at the time of her wedding. Her husband noticed a change soon after the birth of their child. Other witnesses, mostly her relatives, who had ample opportunities for personal observation, discovered mental aberrations within two or three months after the marriage, and this view is supported by the weight of the evidence. Nor can the cause of the mental disturbance be definitely ascertained from the lay evidence. Although it is charged that the husband's mistreatment produced the condition, it should be said, in justice to the young man, that the psychiatrist testified that defendant had definitely stated to him that he had not mistreated her. It may be, as the husband contends, that she brooded because she had not been able to marry a former "boy-friend", and thus brought upon herself the consequences of her own actions. Howbeit, the inescapable fact is that at some period in her married life defendant became mentally deranged.

After the birth of the child, the family physician, because of defendant's continued and extreme nervousness, recommended that the husband take his wife to a Pittsburgh specialist. As a result she was confined to the St. Francis Hospital in that city for a month. Later she was examined by a competent psychiatrist, upon whose report she was committed to the Torrance

Mental Hospital, where she was an inmate at the time of the master's hearings. The psychiatrist's examination revealed a "great deal of emotional immaturity, her mood was labile, [with] inability to coordinate her thinking." The "basic reasons" for her condition, the psychiatrist testified, was "an arrested psychosexual development, [and] she was unable to meet the adjustments necessary to being a wife and a mother." He did not find her insane, but stated that "she manifested certain behavior which is interpretable as being pre-psychotic." He explained that a "psychosis entails the loss of intellectual judgment"; that she was mentally sick; and that the married state and maternity contributed to her illness. The conclusion must be that, although defendant is not insane, she is and has been, throughout the greater part of her married life, definitely mentally deranged.

Appellant's able counsel argues here that since complete insanity was not shown and that at most defendant is suffering only a psychosis, she was legally responsible for her conduct, and hence no impediment to a divorce exists. But the cases hold that conduct which springs from mental ill-health, whatever its nature or severity, should be regarded as unintentional and lacking the spirit of hate, estrangement, and malevolence, which is the heart of the charge of indignities. *Crock v. Crock,* 96 Pa. Superior Ct. 377; *Grey v. Grey,* 113 Pa. Superior Ct. 215, 172 A. 412; *Castner v. Castner,* 159 Pa. Superior Ct. 387, 48 A. 2d 117; *Fawcett v. Fawcett,* 159 Pa. Superior Ct. 185, 48 A. 2d 23; *Glass v. Glass,* 164 Pa. Superior Ct. 118, 63 A. 2d 696; *Duchossois v. Duchossois,* 139 Pa. Superior Ct. 1, 10 A. 2d 824; *Benjeski v. Benjeski,* 150 Pa. Superior Ct. 57, 27 A. 2d 266. Cf. *Schulze v. Schulze,* 33 Pa. Superior Ct. 325, 330, where RICE, P. J., said: "There is a manifest and very substantial difference between a course of conduct consisting of false, mali-

cious, abusive, humiliating and insulting accusations persistently, continuously, and without provocation addressed by the respondent to the libellant, and the scolding and fault-finding attributable to irritability caused by disease or nervous disorder, . . ."

Parties to a marriage take each other for better or worse, in sickness and in health, *Allen's Appeal,* 99 Pa. 196, and the inconvenience or even the mistreatment suffered in consequence of a spouse's ill-health does not constitute a ground for divorce. "The law does not recognize conduct resulting from such causes [ill-health] as a ground for divorce. The situation of the husband doubtless is, and has been, a most unfortunate one, requiring patience and forbearance, but the law does not recognize this as a ground for divorce": *Crock v. Crock,* supra, p. 383.

Decree affirmed.